Our second case for this morning is Jocelyn Chatham v. Randy Davis, warden of Pickneyville Correctional Center. Mr. Smith, when you're ready. May it please the court, Christopher Smith on behalf of the plaintiff appellant. This case is about the death of a 26-year-old man, Marvin McDonald, who died from an asthma attack, an asthma attack that lasted over four hours in a situation where he was confined to a prison, but a prison with correctional officers and medical staff, and a mere minutes away from a hospital. It is not theoretically the worst place to have an asthma attack. However, he died due to a complete systematic failure of the prison and its medical providers. His death could have been prevented various times, but instead Marvin was met with failure after failure. So we're dealing here, just to make sure I'm clear, with your case exclusively against the warden on the one hand and Wexford on the other hand? Yes, Your Honor. The appeal is about the fact that the plaintiff never got to put on trial the parties that were responsible for the systematic failures, and that being the warden and Wexford. I just want to make sure I understood, because obviously looking at the warden first, there's a significant line of cases that there's no respondeat superior liability, so whatever was happening further down the chain may not be the warden's problem. What is it exactly that you think the warden failed to do? Well, we'd agree with those cases, but in this case, he was directly responsible for what caused the death, and that being he had a contract with Wexford, wherein Wexford was to provide a medical director, and the medical director was to provide, number one, the training to the staff on policies, both general and specific to this case. Number two was supposed to act as the on-call doctor, which this happened at night when there was no, Pickneyville was supposed to have its very own on-call doctor, and there was no medical director for over a year in this facility. So is that the warden's fault, or is that Wexford's fault? Well, it's a shared responsibility, because when you enter a contract, it would be the kin of a warden contracting with a food service provider for its prisoners, and then standing back and saying, oh, well, they didn't come today, they didn't come today, they had no food for 82 days in a row, and finally somebody died. The warden has a direct responsibility to say, you have to perform under your contract, and absolutely. He also had the responsibility to put in a communication of emergency system between the prisoners who were in an emergency and the correctional officers, and in this case, in the unit where Mr. McDonald was housed, there was really no medical emergency communication system, and it wasn't just about the buzzers in this case. It was that the prison itself had buzzers in the other wings and the other housing, but in this unit, where you actually needed buzzers more, they didn't, and the officer testified that this unit was so loud that they would drown out the complaints, because it was constant. Well, now, the state argues, as to the buzzers, qualified immunity. The state says that there are no cases that have recognized any kind of right to an emergency call button, so it seems to me that's way too specific. I mean, is it your argument that there's no effective alternative system either? Correct, but we would agree that buzzers alone, if that was the issue, the case law does support the fact that there would be qualified immunity on that. Right. But when you don't even have any system, and when you know from your other portions of the prison that, hey, we've got to put in buzzers here, and that's why they did it. So there's no, like, video surveillance of your cells? There's no video surveillance. And so, you know, it was strictly, hey, guards, come get me, but it was so loud that they would drown it out. So essentially there was no way to effectively communicate the emergency. And, again... And you think that the Eighth Amendment requires at least some method. So if an inmate is seeking, whether medical or anti-violence or other assistance, he's got to be able to reach the guards.  That's the primary point of having correctional officers, in addition to having people not escape, to protect them in situations where they need things, because you can't do it yourself when you're a prisoner. And the same thing with respect to the medical situation, where you can't go to a hospital yourself, you have to have a system to be able to get yourself to a hospital. And that's why the medical director and the on-call doctor are so important. But your opponents argue with respect to the medical director that it's not that there was no one. I mean, there was no person with the title medical director, but there was this doctor who, I guess, sleeps through the first call, if I'm remembering. We have so many of these medical cases today, I'm going to probably confuse the facts at some point. But there were people who could be reached. Why isn't that enough for the Eighth Amendment? Well, it certainly would have been an issue for the jury in our mind. This was a medical director. You've heard his name already mentioned in the case before you, Dr. Larson, who was operating under potentially 12 facilities over 361 miles. When you calculate the fact that the contract called for our own medical director, our own on-call doctor, it's no shock when you have a doctor who's servicing 12 facilities, doesn't even know what facilities he's serving half the time, is on-call 24 hours a day, 7 days a week, 365 days a year. That is, by any standard, insane. And that's the problem here. Is that a medical director? A lot of doctors would probably agree with you. He says, excuse me? Judge Calvert's asking, is that a term of art? It's beyond deliberate indifference in any event. So I just don't know why this is on the warden's head. I mean, it seems to me maybe this is a Wexford argument, but why is the warden responsible for the way the state of Illinois, or Wexford for that matter, allocates that responsibility? Well, you can't sit back and watch no medical director, no provider of training, no provider of on-call service, not show up day after day after day after day. And any warden... But do we have any evidence in this record that a medical failure like this was a regular occurrence at Pinckneyville? The medical failure that no one was there is of record. Well, with consequences, though. I mean, if this is an unfortunate tragedy for this man, but why would the warden know that this structure was ineffective unless there were numerous such incidents? Well, just as in the Thomas case, when something is so obvious that if you don't have an on-call system at night to be able to get prisoners care, your entire population is in jeopardy. There was an on-call system. There was not an on-call system that worked because you needed, A, to know what to do. And in this case, the nurses did not know. The nurses, the head nurses, did not know the policy. They didn't know the policy with respect to this. You mean the policy with the below 200 reading? To call 911. To call 911. Yeah, I mean, when you've got a guy coming in. And that, in part and parcel, was also a combination of, well, we've got this system here, but it's not an effective system. Of course, if you have an on-call system, just because you have a so-called on-call doctor, but when you know it's not going to succeed, it's just as bad, if not worse, than having one. Provide an adequate system. That's life and death. I mean, emergencies at night are life and death. You have to provide an on-call system. And the warden, any correctional warden in the country, would tell you that if I have a contract for a medical doctor, I'm going to darn well make sure that medical doctor is showing up regularly, let alone not for over a year. What's the evidence of causation? Well, in this case, the evidence of causation is actually very clear as to all the issues, because what happened here is this six-hour period you look at in chunks. Essentially, the first two hours, Marvin was in his cell having an asthma attack. People were screaming. Nobody could get any attention. And it's causing a panic. And the fact that they didn't have a good system at all to get him emergency attention caused a two-hour delay, approximately, to get him to the medical people who were 200 feet away. The next section is those medical people, when they got to him, he showed up with the exact medical diagnosis that they knew required, under their own policy, required calling 911 immediately to a hospital that was 10 minutes away by ambulance. And instead of doing that, the nurses gave answers like, we didn't know whether it was this policy or this policy. We didn't know what calling 911 meant. We thought it was enough to call a doctor. And that medical director... That's the PEFR. They measure his PEFR, and they get 150 or something, right? Correct. And under 200, you had to call 911 immediately. And they measured it three and four times. And each time it was under 200, not just once. 600 is normal, right? 600 is normal, correct. That's in the record. And we might have had as low as 125, which, under any circumstances, it was a 911 call. But they had the defense that, hey, we didn't know. We didn't know what our policy was. We didn't know whether it meant call the medical director who was acting as Superman for 14 facilities. We didn't know. So if you could focus maybe your answer to Judge Sykes's question on the case now against Wexford. I've been asking about the warden, but I would like to know why we have a Monell case against Wexford here under these circumstances. Well, Wexford, and when I say it's the warden's responsibility, it's definitely Wexford's responsibility to provide the... It's in the contract, right? It's right there in the contract. That's what you're paying for. And they're undercutting that payment on the back end and not providing medical directors. And then those medical directors don't do the training and telling what the policy is. Heck, they didn't even know what the policy was a year and a half into the case in this situation. They're responsible for that on-call doctor and having those systems. And, again, it failed even again a third time after the two hours of not calling 911. It takes two hours to finally get somebody to call back because a person who's on call 24 hours a day, seven days a week, 365 days a year didn't happen to pick up the phone. And those are direct failures of Wexford and how they did not supply a basic element, a central element of what Pickneyville contracted for in that medical director. For us not even to get to take those... Summary judgment wasn't really even about the facts of our case. This was a summary judgment based on arguments for the warden that was two sentences with unsupported facts, essentially saying, well, we didn't know Marvin McDonald, we didn't know his medical issues. That wasn't what this case was about. Wexford, well, we have great written policies. Mr. Smith, you're in your rebuttal. You can do whatever you want. If I could just finish this sentence. In terms of Wexford, it was about, well, we have great written policies. Well, if you throw your written policies into a safe and don't let your people read them or know about them or train them in them, that's just as bad. And the idea that these arguments were almost waived arguments and the idea that we never even got to present our facts in this case and then to further be hurt in the discovery process. If you look at the Thomas case and cases like it, it takes real discovery to understand what policy failures are. And each step, the plaintiff was hurt in the discovery process. Four months on the prisoner call. Over a year to get the Wexford discovery. The policy documents we were given were wrong, absolutely the wrong documents, three days before the closure of discovery. I mean, this was a case where, and then we're the ones who are not being given the ability to amend our complaint. Every step of the way, this man should have been simply about who's responsible for this death that was wrongful to him. That's the whole case should have been about. All right, you can save the rest of your time for rebuttal. Thank you. Mr. Elitz. Good morning, Your Honors. May it please the Court. Illinois Assistant Attorney General Carl Elitz for the State Defendants. Your Honors, it seems like my opponent has waived his claims against the prison guards. The last line of his reply brief says that he's seeking relief against the policy holders, the doctor, and the nurse. So I was somewhat unsure whether he was bringing claims against the guards on appeal or not, and it seems like he's made it clear that he's not seeking new trial against the guards. There was a trial, though, against the guards, and the jury came back and found that the guards were not liable. I think from that, the Court should take the fact that there was not a delay by the guards, although there was testimony in summary judgment that the cell blocks often were loud. There was also testimony that on this night it wasn't loud. So it seems odd to me, to say the least, that the system for notifying the authorities in this prison of problems on that wing is for the inmates to shout, because actually, in my experience, inmates are frequently given disciplinary tickets if they become rowdy and disruptive and shout. And so I gather, though, that that's the system, that you just have to have the inmates shouting loud enough, and it's too bad if somebody happens to be in a single cell. I don't know that there are single-cell prisoners. Maybe there are, but that was the testimony. But suppose your cellmate doesn't like you and sees you in the middle of an asthma attack and decides not to shout. It seems like an odd system, as opposed to video surveillance or, you know, buttons or any of a number of other things, I would imagine. And I have to concede, as my opponent says, that apparently the rest of the prison did have a button system, but there wasn't one in segregation. However, in this case, we know that... Of all places for there not to be a system where the most dangerous and difficult people are housed. We know that in this case, the symptoms were first brought to the attention of the guards around midnight at the time of the prisoner count. And that's just a fact that was established at the trial. And perhaps that's why my opponent doesn't want to talk about what happened at the trial, but we know that the guards were first notified. The cellmate, I think, testified that way. So there's no suggestion here that there was a long delay before the guards got to him. There was a suggestion before trial, but after trial, I don't think he can possibly say that. Deliberate indifference with regard to the warden. They have to show a subjective component. We can see the objective component, that asthma was a serious condition. But the warden has to be aware of facts suggesting the risk. And then the warden has to actually draw the inference that the prisoners are at risk. So what about this theory... I have had trouble finding any case that says that there needs to be something as specific as an emergency call button, although the more general notice issues is interesting. But what about the other side of this? And that being the warden's duty under the contract, or the warden's responsibility to make sure contracting parties live up to their obligations at his prison? In the Wexford contract, they're supposed to hire a medical director, and who's going to enforce that if not the warden? It's my understanding that it's not the warden's obligation to enforce the contract.  So who's the Department of Corrections? Department of Corrections? The director? I mean, there has to be, like, a human being someplace. The contract is with the department and the director, and he would be responsible, ultimately, for making sure the contract's enforced, not the warden. In this case, the warden wasn't deposed. And I suspect if the warden had been deposed, those facts would have come to light. That's really the reason why, among two or three others, that the plaintiff can't win against the warden. We don't know what was in the warden's mind on this record. As Your Honor suggested, I don't see any evidence here of causation, that anything the warden did caused it. I mean, they have a theory. Their expert, McAndrew, doesn't say that he's concluded that there's causation. He says it might have caused the plaintiff not to die had they followed this protocol. That's not causation evidence. That's a theory that the expert had on nothing. Well, if it's only that the warden didn't hire a medical director, that does seem pretty remote from what eventually, unfortunately, happens. I think there's that theory and the theory of the buzzers, Your Honor, and I don't think either one of them is sufficient to show liability under the difficult showing that's required for deliberate indifference. I don't want to eat into my co-counsel's time, so if there's any questions. Apparently no more. Thank you so much. Mr. Sharp. Good morning. May it please the Court. Rodney Sharp on behalf of Wexford nurse Rhonda Reuter and Dr. Dennis Larson. The evidence in the record in this case establishes that Wexford employees, nurse Reuter, and Dr. Larson, acted with concern for Mr. McDonald, not indifference. What about Wexford's failure to have a system that ensured that a doctor could be reached immediately when something happens? That didn't happen here. Dr. Larson slept through the phone call. There seems to have been no plan B, no alternative to just sort of shrugging your shoulders and letting two hours go by. No, there was an alternative. There was 80 minutes between the phone calls, and Dr. Larson called back 80 minutes later. But I'm just going to say, if somebody's bleeding to death or they can't breathe or whatever, 80 minutes is life and death. Well, the testimony in the record is from nurse Rhonda Reuter that this had never happened before, whether she'd never had to send a patient out because doctors normally return the calls. And that happens in private practice. Sometimes doctors, even when they're on call, they can't be reached immediately. In this case, there was a doctor on call. He was the regional medical director, and he acted quickly to send the patient out within 30 minutes after changing the treatment regimen that had already been begun by nurse Reuter. Nurse Reuter administered three albuterol treatments, which the plaintiff's expert, Dr. Himmelman, said, sometimes it takes one, two, three, or more for an asthma attack to resolve. She administered epinephrine. The patient, the inmate, he was sitting there quietly by her side the entire time. Why didn't she call 911 with the respiratory reading of 150? Because you treat the patient, not the labs. Oh, that's a slogan. I don't buy that. But it's the truth. If there's guidance that 200 requires enlisting more troops, so to speak, sending somebody to the ER, I don't understand why there isn't pretty clear guidance given to the nursing staff when there's no doctor in the building. Call a doctor or send the patient to 911. She had called the doctor. She was waiting for a return phone call. All the evidence in this case. This is outrageous. Would you want your cat to have that kind of treatment? I would want my cat to have appropriate treatment, which is exactly what was given to Mr. McDonald. He got to the emergency room, and the same treatment continued for 90 minutes in the emergency room that had been begun at the institution. But it was begun too late, right? There was no evidence of that. Well, he dies. People do very rarely die from an asthma attack. Well, it certainly suggests the treatment was ineffective, doesn't it? No, it does not. He died as a result of a failed intubation during an asthma attack. Well, I would think that's a question of fact. Now, there's evidence from that from Nurse Kellerman's testimony at trial. But the only testimony in this case was that the treatment rendered were appropriate treatments given for a patient suffering from an asthma attack. There's a very slow notification procedure. There is evidence that it's an objective. Everybody agrees it's an objectively serious medical condition. Wexford has policies that mean people can wait up to two hours before life-threatening conditions are treated, and that's what we have here. There's no policy. It was contractually obligated to hire a medical director, and it didn't do it. It didn't train its staff for this emergency procedure. Your Honor, there was a medical director. There was Dr. Dennis Larson, who was serving as the regional medical director, and then there was Dr. Jill Wall, who served as a traveling medical director. It's not always easy to recruit physicians to correctional medicine downstate Illinois, and as a result, Wexford employs traveling medical directors. Dr. Jill Wall was there that day and the day after. She doesn't take calls, so Dr. Larson takes the call for her, and so there was a medical director in place, somebody performing the responsibilities, and there's no evidence in the record whatsoever that the nurses weren't trained. Rhonda Reuter herself said, I knew that I could send him out if I felt that it was necessary. I thought there was evidence that the nurses were not trained in this specific situation. There was no evidence of that. In fact, Sherry Laurent, who was the corporate vice president of Wexford. She's the 30B-6. She was the 30B-6, and what she testified to is calling 911 is nursing 101. If the nurse knows that the patient needs it, they need it. But this was a man who sat there calm, talked. He was quiet, but he was able to converse. She was able to get a history from him. Mr. Smith has painted a very different picture than what the facts in the record show. That's not surprising, right? Not at all. That's what litigation is all about. I mean, the question is, does a jury need to resolve these issues? Because the district court writes when health care took his vitals at 12, 15 a.m., he's got a pulse, he's wheezing, he's using accessory muscles to aid in breathing, he's got the peak expiratory flow rate of 150. This is all in the district court's opinion. This is not anybody's brief. He never gets his PEFR above 150, even though it should have been 610. And there he sits for a couple of hours with these nebulizers and some prednisone and oxygen and getting treatment. And the uncontradicted evidence was that his O2 sats, his oxygen saturation, improved during that period of time, particularly after an additional steroid was added. And so he got to the hospital. He wasn't seen at the hospital by a physician for 15 minutes. But obviously the oxygen saturation level isn't the only thing. He dies, the code blue is 5.53 a.m. He's dead by 6.09. That's two hours after he arrived. He arrives for the first 15 minutes. He's just with the nurse, just like he was at the prison. Because he can't breathe. Just like he was at the prison. And thereafter, but here the two individual defendants were found not, by the jury, found not to be deliberately indifferent. But they may not have been. That's the distinction I was trying to draw. It's quite possible that the individual people might not be deliberately indifferent because they're just following the policies that the corporate defendant has, or maybe they're stupid or maybe they're, you know, tired or maybe whatever. Any number of reasons. Maybe they're just negligent. That's not deliberate indifference either. But there could still be something wrong with the policy. What policy are we talking about? What is the policy? The plaintiff has failed to enunciate any specific policy or practice. As the Court has already noted, there is nothing in the evidence to suggest that this had ever happened before and the plaintiff hasn't enunciated a policy or practice that would have been a moving force behind the actions of these two individuals who were found to be not liable in this case. Right. Now, I understand the policy arguments to be, A, no on-site medical director. This traveling system and regional system wasn't good enough. And, B, failure to train the nurses who were right there on-site. I mean, just descriptively, I understand those to be the policies they're asserting. And as I indicated, there was a medical director. But not on-site, of course. No, there was. Dr. Jill Wall was there that day and she was there the day after. But not available in the night. Performing their duties. No, but there was an on-call doctor and he was called and he responded. And he didn't respond for 80 minutes. Half full or half empty. And the patient received constant treatment that the plaintiff's own experts say was standard treatments for asthma. Thank you. We ask that the judgment be affirmed in all respects. All right. Very good. Anything further, Mr. Smith? Just directing attention. The arguments, when you don't get to see the full picture, the arguments that are being made can work. Could you clarify, though, since Mr. Sharp has just said that you have not been clear enough about what particular policies, as clearly as you can say, you think Wexford had that were deficient? They failed to provide a medical director who was the trainer of both general policy and the specific policy that was failed that killed Marvin McDonald, and that they did not have the on-call system at night. And when we bring up things like Jill Wall, who was disclosed two days before the end of the discovery, that has nothing to do with what happens to prisoners at night. She came there and serviced some people during the day. It has nothing to do with the big picture. It couldn't have done one iota, and it was agreed to that that wasn't even going to be a witness at the trial because it had nothing to do with what happened to this man. And these are the kinds of things, just as the word concerns. People who work in prisons, generally speaking, do not want people to die in their laps. And it's oftentimes the system that is there that is a failure when you have these basic things that aren't being provided that cause these lapses that prevent them from getting the help that would have saved this man. And nobody was really even arguing that Marvin shouldn't have survived this. And here we are getting piecemealed what was the fault of the system versus what's the fault of the thing. If they would have been in this case, the jury would have seen these failures and how they affected Marvin McDonald directly. And that's all we're asking. We wanted the chance to prove the facts and prove what happened, and we didn't even get that. And clearly, if you look at the case law under Woodward v. Correctional and Legislative Services, Thomas v. Cook County, and the New Jersey court in Andrews v. Camden went through the whole analysis how that medical director, failing to admit your basic contract requirements, has the trickle-down of causing all these problems, that that whole facility, all those prisoners are in jeopardy, and they should know it. And they're the medical people, and they knew the deficiencies here. The plaintiff was on the other side scrambling to be able to establish this, and they've never even now given you the facts that relate to Wexford with respect to medical directors, with respect to how their at-nighttime service applies as to what their policies were. They got to avoid them entirely. That summary judgment motion should have been denied without our facts, but we preemptively put the facts in play that show these weaknesses in policies that caused Marvin McDonald's death. Okay. Thank you. All right. Thank you very much. Thanks to all counsel. We will take the case under advisement.